GREENFIELD & GOODMAN, LLC
RICHARD D. GREENFIELD
(Admitted *Pro Hac Vice*)
MARGUERITE R. GOODMAN
250 Hudson Street 8th Floor
New York, NY 10013
Telephone: (917) 495-4446
Facsimile: (212) 355-9592
Email: whitehatrdg@earthlink.net

ROSE F. LUZON (SBN 221544)
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
401 West A Street Suite 2350
San Diego, CA  92101
Telephone:  (619) 235-2416
Facsimile:  (619) 234-7334
Email:  rluzon@sfmslaw.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **J. N. FEUER**, Derivatively on Behalf of **WELLS FARGO & COMPANY** and its Shareholders and "Double Derivatively" on Behalf of **WACHOVIA CORPORATION**, <br><br> Plaintiff, <br><br> v. <br><br> **G. KENNEDY THOMPSON; THOMAS J. WURTZ; HERBERT SANDLER; MARION   SANDLER; JOHN T. CASTEEN, III; JOSEPH NEUBAUER; MARYELLEN C. HERRINGER; TIMOTHY D. PROCTOR; VAN L. RICHEY; DONA DAVIS YOUNG; ERNEST S. RADY; JERRY GITT; JOHN D. BAKER, II; PETER C. BROWNING; DONALD M. JAMES; JOHN C. WHITTAKER, JR.; WILLIAM H. GOODWIN, JR.; ROBERT A. INGRAM; MACKEY J. MCDONALD; RUTH G. SHAW; LANTY L. SMITH; JOHN S. CHEN; LLOYD H. DEAN; SUSAN E. ENGEL; ENRIQUE HERNANDEZ, JR.; RICHARD D. MCCORMICK; CYNTHIA** | CIVIL ACTION NO.  C 10-0279 PJH <br><br><br><br><br><br><br><br><br> **AMENDED COMPLAINT** <br><br><br><br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

H. MULLIGAN; NICHOLAS G. MOORE; )
PHILIP J.QUIGLEY; DONALD B. RICE; )
JUDITH M. RUNSTAD; STEPHEN W. )
SANGER; ROBERT K. STEEL; JOHN G. )
STUMPF; and SUSAN G. SWENSEN, )
)
        Defendants, )
)
        and )
)
WELLS FARGO & COMPANY, )
)
        Nominal Defendant. )
)
)
)
)
)

## AMENDED COMPLAINT

## NATURE OF THE CASE

1.     Plaintiff J. N. Feuer, a shareholder of Wells Fargo & Company ("Wells Fargo" ) and Wachovia Corporation ("Wachovia" or the "Company") at all relevant times, brings this derivative action on behalf of Wells Fargo and its shareholders and "double derivatively" on behalf of Wells Fargo and Wachovia against certain current and former officers and directors of Wells Fargo and Wachovia and Herbert and Marion Sandler (the "Sandlers") to, *inter alia,* recover substantial damages for the benefit of Wells Fargo and its shareholders.

2.     After a frenzied bidding contest between Wells Fargo and Citigroup, Inc. in the wake of the virtual collapse of Wachovia in September 2008, on October 3, 2008, the acquisition of the Company by merger with and into Wells Fargo was announced, the transaction then having a reported value of approximately $15.1 billion. The combined company was to have $1.42 trillion in assets.[1] Wells Fargo, until the acquisition of Wachovia, had presented an image of being one of America's more conservative banks and appeared to avoid the most noxious property loans and securities. Following the announcement of the acquisition, on October 9, 2008, despite his

---

[1] Included among the assets acquired by Wells Fargo in the merger were, *inter alia,* the very valuable claims Wachovia had against, among others, its officers and directors named as defendants herein and its auditor, KPMG.

knowledge of Wachovia's being a financial "basket case," Richard Kovacevich, Wells Fargo's then-Chairman, crowed about "Wachovia's proud tradition of being one of the very best financial institutions in the world."  In a January 2009 interview with Barron's, Wells Fargo CEO, defendant Stumpf, said that he had projected before the merger that losses from the Wachovia acquisition would be in the range of $60 billion with about $40 billion in write-offs.[2] He is quoted as having disputed Wall Street claims that Wells Fargo regretted the acquisition. Upon consummation of this merger, Plaintiff's Wachovia share ownership devolved by operation of law (the stock-for-stock merger) into his ownership of Wells Fargo shares.

3.      The claims asserted herein and this action generally are intended to remedy, *inter alia,* fraud in connection with the sale of Golden West Financial Corporation ("Golden West") to Wachovia, massive mismanagement by and dereliction of fundamental duties by the Board of Directors of the Company, breaches of fiduciary duty, waste of the Company's assets (including failing to pursue the massive claims that Wachovia now has or had against the Sandlers, Wachovia's officers and directors and against KPMG and/or permitting such claims to lapse due to the possible expiration of statutes of limitations), the breakdown and utter failure of Wachovia's internal and external audits, deliberate concealment of such wrongful conduct and by failing to recover for the Company and Wachovia the massive damages caused thereby and other conduct described below.  This litigation also seeks relief for Wachovia and, ultimately, for Wells Fargo, for the damages caused by the breaches of fiduciary duty and waste of Wachovia's assets arising from the sham investigation of the conduct set forth in "demand" letters sent by Wachovia shareholders and relief from the ultimate settlement of certain claims embodied in the settlement of *Arace v. Thompson, et al*, Civil Action No. 08 Civ 7905 DC (S.D.N.Y.) (the "*Arace* Case") described below. Plaintiff does not presently plan to pursue any claims asserted herein which arguably are clearly

---

[2] For the fourth quarter of 2008, Wachovia (through Wells Fargo) reported a $37.2 billion write-down of assets. Even through 2009, a large portion of Wachovia's potential and likely losses remained to be acknowledged including a substantial portion of its $100 billion+ commercial property loan portfolio, many of which loans were interest-only with balloon payments at the end and second mortgages such as home equity loans. Indeed, among the critics of Wells Fargo's failure to own up to its actual condition by failing to mark-to-market substantial quantities of its loans was House Financial Services Chairman Frank who said in a letter to Wells Fargo: "Because accounting rules allow holders of these [second mortgages] to carry the loans at artificially high values, many refuse to acknowledge the losses and writed down the loans."

1   released, if any, pursuant to the settlement of the *Arace* Case, pending a ruling by this Court or a

2   ruling by the Court presiding over the *Arace* Case that the settlement therein is null and void for the

3   reasons set forth below.[3]

4       4.     The claims asserted herein are based, in part, upon the abject failure of corporate

5   governance on the part of Wachovia's Board of Directors (the "Wachovia Board"), the massive

6   mismanagement of the Company under their stewardship, the breaches of fiduciary duty by the

7   Company's Board members and senior executives, including the duty of loyalty and unjust

8   enrichment, the waste of the Company's assets, and deliberate concealment of such wrongful

9   conduct during the period from approximately 2005 through its merger with and into Wells Fargo

10  ("Relevant Period").

11      5.     The waste of the Company's assets (and those of Wells Fargo) continued through

12  and following the date upon which Wachovia's merger with and into Wells Fargo was

13  consummated.  Thereafter, despite the fact that the members of Wells Fargo's Board of Directors

14  (the "Wells Fargo Board"), two of whom were members of Wachovia's Board, knew or should

15  have known of the massive and provable claims Wachovia and Wells Fargo had and have against

16  the members of Wachovia's Board, the Sandlers and others, they did nothing to pursue such claims

17  either through litigation or otherwise, thereby wasting the valuable corporate assets of Wells Fargo.

18  Indeed, they attempted to release such valuable claims for no consideration to Wells Fargo in

19  connection with the settlement of the *Arace* Case.

20      6.     Even worse, despite the existence of these massive claims, and aided and abetted by

21  a purported "investigation" of certain of them by a so-called "Special Committee" of the

22  Company's Board and its counsel, Nelson Mullins Riley & Scarborough LLP ("Nelson"), none of

23  such claims were pursued.  Upon information and belief, the members of the Boards of Directors of

24  both Wachovia and Wells Fargo, together with their respective legal counsel and counsel for the

25  respective corporate entities, conspired to effectuate a fraud on the Court, the former shareholders

26

27       [3] Plaintiff will ask this Court to stay the prosecution of any such claims that
    defendants contend on the record are clearly and unambiguously released pursuant to the

28  settlement of the *Arace* Case pending a definitive ruling as to the validity of the *Arace*
    settlement or any of the purported releases therein.

AMENDED COMPLAINT

1    of Wachovia and the present shareholders of Wells Fargo in connection with the settlement of the

2    *Arace* Case, a derivative suit brought purportedly on behalf of Wachovia ("*Arace* Settlement").[4]

3    They thereby caused, *inter alia*, the waste of Wells Fargo's corporate assets, including the valuable

4    claims purportedly released by the sham settlement.

5         7.      The "settlement" of these claims, for which neither Wachovia nor Wells Fargo

6    received any consideration, was effectuated to cover-up and seek the dismissal of many of the

7    claims asserted herein. The Individual Defendants herein, including those defendants represented

8    by Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried") in the *Arace* Case, effectively sold out

9    Wachovia and Wells Fargo by causing the no-consideration "settlement" of the *Arace* Case to be

10    "negotiated."

11         8.      The *Arace* Settlement was a fraud on the Court and all Wells Fargo/Wachovia

12    shareholders in that material facts were misrepresented to and concealed from the Court in order to

13    seek its approval, which was forthcoming on November 24, 2009. In particular, Fried, improperly

14    representing **all** defendants (including those with diametrically conflicting interests) in the *Arace*

15    Case, presented to the Court a Preliminary Approval Order providing for purported Notice to the

16    shareholders of Wachovia and Wells Fargo which Fried and all the Individual Defendants knew or

17    should have known was grossly inadequate, not in compliance with Rule 23.1 of the Federal Rules

18    of Civil Procedure and the mandate of the Supreme Court of the United States in *Mullane v.*

19    *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 653, 657, 94 L. Ed 865 (1950).

20         9.      Plaintiff, and all other shareholders similarly situated, should have received

21    individual mailed notice of the *Arace* Settlement, which is the traditional means of providing notice

22    of shareholder derivative settlements, especially since, as here, Wachovia and Wells Fargo had the

23    names and addresses of all shareholders of record and had the means to also provide written mailed

24    notice to all other beneficial shareholders. Plaintiff never saw or received any notice of the

25    existence of the *Arace* Case or of the *Arace* Settlement until after the commencement of this

26    litigation. Consistent with the efforts of Fried and its clients, as well as the members of the Wells

27

28

---

[4] By the time of the *Arace* Settlement, Wachovia had already been merged with and into Wells Fargo. Thus, Wells Fargo was the *de facto* party whose claims such settlement attempted to release for no consideration.

AMENDED COMPLAINT

1  Fargo Board of Directors, to conceal the existence and proposed settlement of the *Arace* Case,

2  notwithstanding the letter written to the Boards of Wells Fargo and Wachovia on April 1, 2009,

3  sent on that day via FedEx and received a few days thereafter, none of such Board members or their

4  counsel advised Plaintiff's counsel of the pendency of *Arace*, the investigations purportedly

5  conducted by Wachovia's "Special Committee" and Nelson, or the proposed settlement of the

6  *Arace* Case.  Had Plaintiff been so informed, he could have sought intervention in the *Arace* Case

7  as well as objected to the sham settlement, which was wholly inconsistent with the demands set

8  forth in his April 1, 2009 letter as described below.

9        10.     Instead, counsel for Wachovia in the *Arace* Case, Fried, which itself was in an

10  egregious conflict of interest because it was also simultaneously representing the members of the

11  Wachovia Board, the defendants in the *Arace* Case, together with counsel for the plaintiff therein,

12  foisted on the Court a minimally published and non-informative "summary" notice in the

13  September 25, 2009 issue of <u>Investor's Business Daily</u> advising those few who might have read it

14  that a more elaborate but similarly non-informative formal Notice of Pendency and Stipulation of

15  Settlement might be obtained from the counsel for the plaintiff in *Arace*.  Upon information and

16  belief, a fraction of 1% of Wachovia's shareholders requested such documents.  Indeed, Fried and,

17  *inter alia,* the defendants in the *Arace* Case knew that such Notice would be ineffective in reaching

18  Wachovia/Wells Fargo shareholders and budgeted only a maximum of $50,000 for the entire

19  process.

20        11.     Neither the Summary Notice nor the Notice of Pendency in the *Arace* Case disclosed

21  what claims were to be released against which defendants (and non-parties) for what alleged

22  wrongdoing.  As such, the *Arace* Settlement and the purported notice thereof to Plaintiff and other

23  Wachovia/Wells Fargo shareholders was a gross violation of their due process rights.  In conspiring

24  to deny the due process rights of Plaintiff and the other Wachovia/Wells Fargo shareholders and

25  inducing the Honorable Denny Chin to approve the *Arace* Settlement, which purported to release at

26  least some of the claims asserted herein, the Individual Defendants, aided and abetted by Fried,

27  wasted the assets of Wachovia and Wells Fargo and breached the fiduciary duties owed to such

28  entities in order to unjustly obtain releases of the claims asserted against themselves and/or their

1   colleagues as well as certain non-parties not identified in either the *Arace* Stipulation of Settlement

2   or the Notice.

3         12.    In acting as they did, the Individual Defendants together with Fried committed a

4   fraud upon Judge Chin, Wachovia, Wells Fargo and their shareholders, all of which caused

5   damages to them which are not presently known to Plaintiff.

6         13.    The course of conduct described in more detail below principally concerns, *inter*

7   *alia*, the incredible failure of the Wachovia Board and its individual members to fulfill even the

8   most basic of their corporate stewardship responsibilities as required by federal banking rules,

9   regulations and policies, their total disregard of the risks undertaken by their subordinates in

10  management and the reckless practices of Wachovia's investment bankers of packaging of

11  "subprime" and other "alternative" mortgages into collateralized debt obligations ("CDOs") and

12  other securities.

13        14.    In addition to the claims asserted herein against the Sandlers, this action seeks to

14  recover from the members of the Wachovia and Wells Fargo Boards for the damages Wachovia

15  sustained and which Wells Fargo has sustained and will sustain. These claims are asserted as a

16  consequence of, *inter alia*, the waste of Wachovia's and Wells Fargo's corporate assets by failing

17  to pursue the massive claims that Wells Fargo now has against the Sandlers, Wachovia's officers

18  and directors, KPMG, LLP ("KPMG"), Fried, Nelson and/or possibly permitting certain of such

19  claims or others to lapse due to the expiration of statutes of limitations. Indeed, as to KPMG, the

20  Wells Board continues to protect it despite the massive failure of its purported audits of Wachovia's

21  financial statements and has continued to use it as Wells Fargo's own external auditor, despite

22  KPMG's lack of independence to serve in such capacity.

23        15.    This litigation also seeks relief from the *Arace* Settlement and, in particular, the

24  release language incorporated in the Stipulation of Settlement and any consequential damages

25  caused to Wells Fargo and its shareholders.

26        16.    No claims are asserted herein against Wells Fargo or Wachovia, in whose names this

27  action has been brought.

28

AMENDED COMPLAINT

1

## **FACTUAL BACKGROUND**

2

### **Wachovia Was A Bloated "House Of Cards"**

3   17.     During the period of approximately 2005 through 2008, Wachovia went from being

4   one of the nation's apparently strongest, well-capitalized and largest financial institutions to a

5   veritable "basket case" that was effectively bankrupt with massive reported and unreported losses at

6   the time of its acquisition by Wells Fargo.

7   18.·     The massive deterioration of Wachovia's financial condition was a function, in part,

8   of its sheer size, which its Board and senior management recklessly permitted to grow without,

9   among other reasons, taking appropriate steps to protect and preserve its assets and, in particular,

10   ignoring the risks faced by the Company in its then-current circumstances. Indeed, there can be no

11   doubt as to responsibility for the Company's mania for growth at any cost and blindness to risk,

12   which must be clearly laid at the Wachovia Board's doorstep.

13   19.     In The New York Times of February 6, 2008, it was recognized that the Company

14   had "a reputation as an acquisition machine." Wachovia's Board and senior management created

15   an ever-expanding behemoth and, in the process, wasted the Company's assets by staggering

16   amounts, by failing to oversee and carry out effective risk management and effectively building it

17   into a "house of cards." Even Wachovia's former CEO, defendant G. Kennedy Thompson, whom

18   its Board continued to stand by and defend despite initially taking away his title as Chairman, had

19   effectively acknowledged that he and his colleagues had made Wachovia far too complex to

20   manage and the Company's problems as "self-inflicted wounds."

21   20.     Under the circumstances, as noted in the Charlotte Observer on May 10, 2008, this

22   change (i.e. stripping defendant Thompson of his title as Chairman) was nothing more than

23   "window dressing" leaving "the same group of people performing the same roles."

24   ### **Wachovia's Acquisition Of Golden West**

25   21.     Notwithstanding defendant Thompson's belated acknowledgement that Wachovia's

26   $25 billion acquisition of Golden West in 2006 was "ill-timed," neither he nor Wachovia's Board

27   have admitted that this acquisition was made without adequate due diligence and without

28   considering the nature and abysmally poor quality of much of Golden West's loan portfolio,

1 | particularly mortgage loans originated through its "Pick-A-Payment" promotional activities

2 | (adopted thereafter by Wachovia itself). Compounding Wachovia's lack of appropriate due

3 | diligence and disregard of prudence in connection with the acquisition of Golden West, Golden

4 | West's controlling shareholders, the Sandlers, provided Wachovia and the investing public with

5 | false and misleading financial statements which concealed the true nature and sub-standard quality

6 | of much of its loan portfolio. Had a thorough and competent investigation of Golden West been

7 | carried out by the Company's management prior to the consummation of the acquisition, the true

8 | state of its financial condition would have been known and, conceivably, could have been acted

9 | upon by the Wachovia Board. As it was, the Wachovia Board merely "rubber stamped" the

10 | acquisition of Golden West at the behest of defendant Thompson.

11 |     22.    Following its ill-considered acquisition of Golden West, the Company then set aside

12 | many billions of dollars to cover Golden West's bad loans together with additional billions for bad

13 | loans held otherwise (i.e. in its own portfolio). The true state of the Golden West loan portfolio

14 | acquired by Wachovia has never been publicly disclosed by either Wachovia or Wells Fargo.

15 | Indications of the dimensions of the problem come from Wachovia's last earnings report in October

16 | 2008. Wachovia reported a quarterly loss of $23.88 billion, among the largest ever posted by a

17 | U.S. company, when it acknowledged the collapsing value of the mortgage portfolio that Wachovia

18 | purchased from Golden West.

19 |     23.    Even the enormous losses that Wachovia belatedly acknowledged in October 2008

20 | still did not come close to a full reckoning. For its fourth quarter of 2008, Wachovia took a write-

21 | down of $37.2 billion on some of its riskiest loans, of which a substantial portion were from

22 | Golden West. Moreover, in that same fourth quarter, Wells Fargo had a surprise $2.55 billion loss,

23 | as it added $5.6 billion to its reserves to prepare to absorb Wachovia and, with it, the remainder of

24 | the loan portfolio from Golden West. Thereafter, the previously unacknowledged losses kept on

25 | coming. In March 2009, the McClatchy Newspapers described Wells Fargo as a "'dead man

26 | walking'" with potential losses totaling nearly $64 billion, and total future risks of about $109

27 | billion. To this day, Wells Fargo conveniently touts the "great deal" that its management made in

28 | acquiring Wachovia while, concurrently, failing to disclose the actual condition of Wachovia's loan

portfolio and the other massive inherited exposures to loss in the wake of the Wachovia transaction. Indeed, most recently, Wells Fargo, through Wachovia, agreed to pay $160 million to settle charges that, prior to the merger, Wachovia Bank had laundered Mexican drug money.[5]

24.   In taking advantage of the reckless acquisition of Golden West by Wachovia executives, Golden West's controlling shareholders, the Sandlers, knew, but did not disclose to Wachovia, Golden West's true operating and financial condition.

25.   With respect to the $121 billion loan portfolio the Company took over from Golden West, as indicated above, a substantial portion of them were its notorious "Pick-A-Payment" loans. Wachovia senior management, in recklessly making the Golden West acquisition when and as quickly as it did, ignored that 60 percent of those loans were in the State of California, where real estate "bubble" conditions were prevailing at the time. If they considered risk at all, Wachovia's senior management and Board of Directors applied long out-of-date estimates of default to these loans, underestimating both the high likely rate of delinquency and foreclosure, and the substantial loss that would occur upon foreclosure.  Far from acting to minimize its exposure, one obvious "red herring" was the imposition of minimum monthly sales quotas for "Pick-A-Payment" loans on employees, with incentive payments and high-pressure scripts to push this very dubious product upon the least appropriate and most high-risk purchasers of homes.

26.   Federal prosecutors and the SEC opened investigations by November 2008 as to whether Golden West fraudulently lured borrowers into high risk mortgages, such as switching them into more expensive loans or falsifying financial information so they could qualify.  Upon information and belief, these investigations focus on the Sandlers' practice of pushing Golden West mortgage sales personnel relentlessly to generate more and more of such sub-standard loans. Moreover, the federal prosecutors and the SEC also were investigating whether the Sandlers,

---

[5] The settlement with the Federal government, announced last month, consisted of a $50 million fine and the forfeiture of $110 million, representing the proceeds of illegal narcotics sales that were laundered through Wachovia Bank, which simultaneously entered into a deferred prosecution agreement with the Justice Department. These practices and the damages sustained by Wachovia/Wells Fargo were among the claims identified in Plaintiff's April 1, 2009 letter to the Boards of Wachovia and Wells Fargo. The $160 million fine and forfeiture represents the biggest penalty ever imposed under the Bank Secrecy Act. Although Wells Fargo now says that it set aside money to pay this settlement, it failed to disclose the extent to which it did so at the time of the merger with Wachovia.

1    Golden West and, later, Wachovia, misled investors about the quality of Golden West's loans.  This

2    put the federal prosecutors and the SEC on the scent of misrepresentations perpetrated by

3    Wachovia on Wells Fargo.  Despite such investigations, in part due to their own culpability,

4    Wachovia's Board gave not the slightest consideration of suing themselves or the Sandlers, even

5    after Wachovia shareholders demanded that they do so. Thus, Wachovia never pursued valuable

6    claims that could have and should have been pursued to recover at least some of the Company's

7    damages.

8         27.    Even after it was well-known that "Pick-A-Payment" loans were a disaster for

9    Wachovia, with the blessing of the Company's Board, its management continued to advertise and

10   promote such loans, which greatly increased the Company's risks and accumulated future liabilities

11   for the sake of near-term appearances. In fact, in 2007, about one-fourth of Wachovia's mortgage

12   volume ($22.81 billion out of $97 billion) was in option ARMs, for which borrowers could make

13   payments of less than the interest – swelling the increasingly uncollectible loan balances on the

14   Company's books.  In this type of loan, which predictably has become a financial disaster,

15   Wachovia had the "honor" of being the second largest provider in the country for last two years of

16   its independent existence.  The April 6, 2009 Business Week recognized Wachovia's dire straits

17   and quoted a researcher describing the Wells Fargo acquisition of Wachovia (with Golden West as

18   its core), "'They can't change the fact that they bought a bunch of crap and the economy is sinking

19   like a lead anvil.'" [6]

20        28.    Not only did the Company, its investment bankers, lawyers and auditor fail to make

21   a thorough and realistic assessment of Golden West's actual financial condition, but it had highly

22   material contingent liabilities which neither the Wachovia Board nor the Company's advisors and

23   auditors could competently evaluate, which each of them knew or should have known and which

24   any meaningful risk assessment would have made plain.

25

26

27        [6] Since the merger was consummated, Wells Fargo's management has been
portraying the merger with Wachovia as beneficial to it. Notwithstanding such
28   representations, Wells Fargo has not publicly disclosed any information to support such
contentions.

29.     These contingent liabilities, which were known or should have been known to Golden West's controlling shareholders, the Sandlers, flow from Golden West's business practices which appear to have embroiled Wachovia in numerous governmental, criminal and civil investigations, as well as litigation by borrowers, among others.

30.     It is bad enough that Golden West's condition was critical and getting worse when it was being considered as a prospective acquisition by the Company. However, Wachovia's Board and senior management failed to consider that the Company was already bloated and unable to cope with a "problem child" the size of Golden West and with the magnitude and complexity of the challenges it faced. Quite simply, Wachovia should have gotten its own house in order before taking on further massive problems that could have been readily avoided.

### The Wachovia Board's Utter Disregard Of Federal Banking Rules, Regulations And Policies In Connection With Its Conduct Of The Company's Business

31.     National banks and their holding companies are regulated by, *inter alia*, the Board of Governors of the Federal Reserve System (the "Fed"), the Office of the Comptroller of the Currency ("OCC") and the Federal Deposit Insurance Corporation ("FDIC").  Each of these agencies, separately or in conjunction with one another, regulated Wachovia and its subsidiary, Wachovia Bank, N.A. as well as prescribed standards of conduct for their directors.

32.     In its October 2003 "Detecting Red Flags in Board Reports: A Guide for Directors," ("Directors' Guide"), the OCC spelled out in no uncertain terms the Wachovia directors' fundamental responsibility:

> **"...the board of directors must oversee the bank's operations to ensure that the bank operates in a safe and sound manner and that risks to the institution are properly controlled."**

33.     As set forth herein, during the Relevant Period, the Wachovia Board ignored this mandate directed to each of its members personally.

34.     In anticipation of the Company's business environment during the Relevant Period, the Directors' Guide warned Wachovia's directors:

AMENDED COMPLAINT

> **"Because of today's more complex business environment,
> directors must understand and assess the existing,
> potential, and prospective impact of risk positions on
> future bank performance. Managing risk prospectively
> means identifying it, measuring it accurately,
> understanding its implications, and ensuring that
> appropriate risk management, control and reporting
> systems are in place before the risks lead to problems for
> the bank."**

35.     Wachovia's directors simply ignored and/or disregarded these warnings which, given the Company's susceptibility to the risks referred to herein throughout the Relevant Period, amounted to utterly irresponsible conduct and a breach of their fundamental fiduciary duties to Wachovia and its shareholders. The Directors' Guide went on to warn Wachovia's directors in terms particularly applicable to the Company's circumstances:

> **"Strong risk management systems are particularly
> important when introducing new products or services,
> when the bank experiences strong growth, or during
> difficult economic times when loan [or other] officers may
> be inclined to take additional risks."**

36.     By the beginning of the Relevant Period, notwithstanding the foregoing warnings, Wachovia recklessly acquired Golden West and was already into the creation and marketing of CDOs and analogous subprime-related financial instruments, relatively "new products or services" with which the members of the Board had little or no familiarity, let alone understanding. Although the Wachovia Board and senior management had a risk management system in place, as each Wachovia director knew or should have known, such a system put form over substance and was ineffectual in addressing the monumental risks faced by the Company.

37.     In addition to setting out numerous so-called "red flags" to which all Wachovia Board members should have been alert and were not, the Directors' Guide went on to alert and underscore Wachovia's directors to their long-held duties:

> **"Although the board may depend on management's
> expertise to run daily operations, the board remains
> ultimately responsible for monitoring the bank's
> operations and levels of risk."**

38. The Wachovia Board and, indeed, senior management, were oblivious to the "red flags" all around them and, in particular, to the staggering risks to which the Company had been made subject, all of which were magnified by the acquisition of Golden West.

39. The Directors' Guide was preceded by a joint 1999 publication of the Fed, the OCC and the FDIC directed to, *inter alia*, officers and directors of banks and bank holding companies, "Interagency Guidance on Asset Securitization Activities," which was particularly applicable to the significant weaknesses in Wachovia's asset securitization practices. This publication advised Wachovia's management and directors, in the context of the Company's securitization of sub-prime related receivables that management was accumulating and/or selling to others in securitized form:

> **"Without appropriate internal controls and independent oversight, an institution that securitizes assets may inappropriately generate 'paper profits' or mask actual losses through flawed loss assumptions, inaccurate prepayment rates, and inappropriate discount rates. Liberal and unsubstantiated assumptions can result in material inaccuracies in financial statements, substantial writedowns of retained interests, and, if interests represent an excessive concentration of the institution's capital, the demise of the sponsoring institution."**

40. Throughout most of the Relevant Period, not only did Wachovia have inadequate "internal controls and independent oversight," but its directors knew or should have known that management's "liberal and unsubstantiated assumptions" about the real values of the Company's securitized and other subprime-related assets resulted in the material overstatement of its assets, earnings and net worth.

41. In the FDIC's unchanged 1992 "Statement Concerning the Responsibilities of Bank Directors and Officers," it made clear that the federal regulatory guidelines applicable to, *inter alia*, Wachovia's officers and directors, were intertwined with fundamental principles of corporate governance and responsibility under and pursuant to common law:

> **"The duty of loyalty directors and officers to administer the affairs of the bank with candor, personal honesty and integrity. They are prohibited from advancing their own personal or business interests, or those of others at the**

**expense of the bank. The duty of care requires directors and officers to act as prudent and diligent business persons in conducting the affairs of the bank. This means that directors are responsible for selecting, monitoring, and evaluating competent management; establishing business strategies and policies; monitoring and assessing the progress of business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; and for making business decisions on the basis of fully informed and meaningful deliberation."**

42.    By acting as they did during the Relevant Period, Wachovia's directors and senior management wasted its assets, breached their duties of due care and loyalty to the Company, and otherwise acted contrary the best interests of Wachovia and its shareholders. Similarly, the members of the Wells Fargo Board have breached their own duties of loyalty and due care by wasting and/or permitting the waste of Wells Fargo's assets by, *inter alia*, failing to pursue through litigation and otherwise those defendants who grievously damaged Wachovia during the Relevant Period.

43.    At relevant times, Wachovia's Board acted as if it were oblivious to the foregoing rules, regulations and guidelines despite the fact that they governed the directors' oversight responsibilities and conduct as fiduciaries of a financial institution. Furthermore, Wells Fargo's acquiescence in the conduct of Wachovia's Board can be explained due to its own failures to comply with banking regulators' rules, regulations and guidelines as set forth above.

### Wachovia's Illegal And Otherwise Inappropriate Conduct

44.    In addition to the Golden West debacle, the members of Wachovia's Board and now the Wells Fargo Board have long known of or should have known that senior management of the Company had caused it to engage in highly illegal or other questionable conduct which subjected Wachovia to material damages. By way of example, Wachovia management knowingly had contracted to provide banking services to fraudulent telemarketers who bilked the elderly of hundreds of millions of dollars. In addition to being named a defendant in litigation brought on behalf of the defrauded victims of this scheme, Wachovia has already paid out or committed to pay out as much as $140 million in connection with management's conduct, including a $10 million

fine to the Comptroller of the Currency. Many "red flags" warned the Company's Board and senior management about this; the Comptroller's central allegation in obtaining this settlement was that some Wachovia officials knew of the deceptive telemarketing practices, but failed to take timely or appropriate action.

45.     Wachovia's executives had received multiple warnings from banks, the Social Security Administration, and the Justice Department Federal Credit Union that Company accounts were being used for fraud, and internal fraud investigators had told Company executives, for example, that 79 percent of the checks submitted by one Wachovia "client" had been returned because of unauthorized withdrawals and the like – 2.5 percent being a sufficient fraud indicator.

46.     Similarly, the Company has been the target of an FBI/Department of Justice investigation of management's participation in municipal bid-rigging in the awarding of guaranteed investment contracts (generally issued by insurance companies and used to "park" municipal bond proceeds pending utilization).[7]

47.     Moreover, Wachovia, and through it, Wells Fargo, faces civil liability as well in lawsuits brought by Mississippi, Chicago, and Oakland, among other governmental entities, that have alleged that named employees of Wachovia would meet secretly and agree to take turns winning bids for these contracts.

48.     In yet another law enforcement imbroglio, Wachovia faced questioning and subpoenas by the Securities and Exchange Commission, state regulators, and  class-action lawsuits, over its issuance and sale of auction-rate securities, practices in which Wells Fargo itself had engaged. According to the lawsuits, Wachovia misrepresented to its customers that these securities were highly liquid, equivalent to cash or money market accounts, and suitable for short-term investing. In fact, investors could not sell their securities, while issuers such as cities and hospitals were forced to pay higher interest rates. As a result, Wachovia, and now Wells Fargo, has paid out and remains exposed to paying out hundreds of millions of dollars as a result of such claims.[8]

---

[7] Wells Fargo itself is a target of an ongoing Justice Department criminal investigation as well as a related SEC proceeding and is suspected of engaging in price fixing in the municipal bond market.

[8] Substantively identical claims were alleged with regard to Wells Fargo's activities by, *inter alia,* the Washington State Department of Financial Institutions.

AMENDED COMPLAINT

49.     As indicated above, Wachovia was also the target of federal prosecutors in connection with its active participation in international money-laundering, principally concentrated in belatedly severed schemes and relationships with Mexican and Colombian money-transfer companies allegedly laundering drug proceeds and, specifically, its failure to comply with anti-money laundering regulations.[9] In addition to paying penalties of $160 million, the Justice Department demanded that the Company enter into a deferred-prosecution agreement that requires extensive law-enforcement oversight. Wachovia management built up its ties to these money-transfer companies as its ill-advised way to tap the so-called Hispanic market, demonstrating yet again an imprudent quest for growth without proper risk management and controls. Indeed, according to a former executive of the Company, Martin Woods, his efforts to probe improper money transfers and the non-existence of appropriate controls were ignored and Wachovia's senior management only questioned his own performance, rather than take action to cease these illegal practices.

50.     Wachovia's mutual fund unit, Evergreen Investment Management Co. (now merged into Wells Fargo Funds Management LLC), misrepresented to the investors in its Evergreen Ultra Short Opportunities Fund ("Ultra Fund") its gross overvaluation of highly questionable holdings. In turn, Wachovia kept its own shareholders in the dark about the Ultra Fund manager's misconduct.  The SEC investigated these charges about Wachovia and, in June 2009, Wells Fargo, which had acquired Evergreen as part of Wachovia, made a dramatic settlement with federal and state securities officials, paying $40 million. The Ultra Fund inflated the value of securities tied to the home mortgages akin to those of Golden West. Massachusetts regulators cited one case in May 2008 in which the Ultra Fund priced a subprime mortgage-backed security for $98.93, even though another Evergreen fund purchased the same security for $9.50.  Ultra Fund managers continued representing the price of the security at full value even when the dealer who had sold them it showed their rationale for doing so was a sham, apparently ongoing for at least three months.  The Wells Fargo Board has taken no action against the Wachovia Board or their subordinates to recover

---

[9] Among the illegal practices, Wachovia's lack of controls enabled exchange houses (known as *casas de cambio*, near the Mexican border, to launder drug money from Mexico, Columbia and elsewhere in Latin America.

1    what are now Wells Fargo's damages in connection with the foregoing conduct, a further waste of

2    its assets.

3         51.    The Company and now Wells Fargo also faces an SEC investigation about a

4    televised misrepresentation by Wachovia's then-Chief Executive Officer and later, Wells Fargo

5    director, defendant Steel, that overvalued Wachovia's prospects just before its acquisition by Wells

6    Fargo.  This SEC-investigated misrepresentation parallels the ones perpetrated by Wachovia's

7    Board and management on Wells Fargo.  The SEC investigation scrutinizes remarks made by

8    defendant Steel on CNBC's Mad Money show on Sept. 15, 2008.  Defendant Steel falsely said that

9    Wachovia had "very exciting prospects when we get things right going forward."  This came the

10   day before he and Wachovia began considering last-ditch measures, such as selling businesses and

11   seeking to be acquired out of desperation.  The acquisition by Wells Fargo was announced publicly

12   barely two weeks later on October 3, 2008.

13        52.    The telemarketing, bid-rigging, money laundering, investment overvaluing scandals

14   will, ultimately, cost the Company and Wells Fargo massive amounts in fines, defense costs and

15   other damages, all of which could have been avoided had Wachovia's Board and senior

16   management exercised prudent and effective operational controls. By not taking any action to

17   recover the damages sustained and which will be sustained as a result of the foregoing conduct, the

18   Wells Fargo Board has wasted and is wasting its corporate assets.[10]

19       **Wachovia's Own Assets Of Questionable Value**

20        53.    Relatively late in its independent existence and prior to its acquisition by Wells

21   Fargo, Wachovia began to acknowledge its own exposure to sub-prime and other mortgage-related

22   write-downs of assets, but concealed the fact that only the "tip of the iceberg" had been disclosed.

23   Wells Fargo and its senior management continue to materially overvalue Wachovia's assets by

24   concealing its exposure to loss from improvidently extended credit card receivables, corporate

25   loans receivable, additional real estate-related loans and "assets" where adequate provisions for

26   _____

27   [10] Wells Fargo also lost a suit over $115 million in fraudulent tax deductions before the United States Court of Claims in January 2010. This loss occurred because its Board refused to deal responsibly with massive claims that its use of sale and leaseback transactions with public transit agencies were shams and lacked "economic substance" as the Court ruled and had rejected settlement offers made by the Internal Revenue Service.

28

AMENDED COMPLAINT

losses have not been recognized.  These include Wachovia's billions of dollars in mortgage-related CDOs, in commercial mortgage-backed securities, and in leveraged loans.

54.    In the over-blown and high-risk nature of the real estate market prevailing during the Relevant Period, in abandoning the business judgment that should have been exercised by them, Wachovia's Board and management gambled heavily on such lending as commercial real-estate prices soared to temporary and artificially high record levels.  As the members of the Wachovia and Wells Fargo Boards (as well as KPMG) were aware or should have been aware, such assets remained overvalued materially on Wachovia's and now Wells Fargo's financial statements by many billions of dollars and, as well, there are material contingencies which are not yet reflected or honestly described in the Company's or Wells Fargo's financial statements.[11]

55.    By way of one example, Wachovia is believed to have sold, through its subsidiaries, CDOs and other structured "investments," highly inappropriate, illiquid and unsuitable investment vehicles for most investors. Wachovia's management also sold to customers CDOs as well as other financial derivative "products," the sales of which appear to have subjected the Company to various investigations by state and other regulators.

56.    Through its subsidiaries, Wachovia's packaging and sale of CDOs and other structured "products" subjected the Company to massive liabilities to purchasers of such "products," none of which liabilities were reflected in its financial statements.  It appears that there remain additional billions of concealed exposure to direct loss and claims which Wells Fargo has not yet publicly acknowledged.

57.    This financial debacle and the deception in its wake were caused by an abdication of defendants' fundamental fiduciary obligations to Wachovia and its shareholders. Such dereliction of duty included a systemic failure of risk management and lax credit standards on the part of Wachovia's Board and within its senior management, all of which caused the Company to suffer billions of dollars in damages as described herein and untold billions going forward.  By the time of

---

[11] At the time the merger agreement was reached, Wells Fargo announced that it would "record Wachovia's credit-impaired assets at fair value." Upon information and belief, it has yet to do so nor did it take appropriate reserves for certain of Wachovia's contingent liabilities.

1   the negotiation of the merger with Wells Fargo, Wachovia had been left perilously short of capital

2   and at the brink of systemic collapse.

3       58.    The Company's failure to honestly and fairly disclose its true operational and

4   financial condition as described herein violates the principles behind and purpose of the Company's

5   "Corporate Governance Guidelines."  Among other requirements of its Board, these Guidelines

6   provided that each of Wachovia's Directors:

> **1. "Ensure that processes, controls and procedures are in place to assure the maintenance and integrity of Wachovia's accounting and financial records and statements"**
>
> **2. "Apply themselves to understanding Wachovia's business, and the significant risks facing Wachovia"**
>
> **3. "Conduct objective and thorough reviews and assessments of the CEO's performance…"**

15       59.    In fact, each Wachovia Director and former CEOs, defendants Thompson and

16   Robert K. Steel, did not act in accordance with these Guidelines and knew or should have known

17   that, as it was structured, the Company's Board was unable to properly supervise the Company's

18   operations and management (which had grown to the point of being uncontrollable), reduce its

19   financial exposure to risk and make sure that its publicly disseminated financial statements were

20   prepared in compliance with Generally Accepted Accounting Principles ("GAAP"), which they

21   were not.  At all relevant times, KPMG knew or should have known that Wachovia's consolidated

22   financial statements, which it was charged with auditing, did not comport with GAAP.  For

23   example, when Wells Fargo first absorbed Wachovia, Wells Fargo's annual filing with the SEC

24   showed its loans receivable to be valued at $14.7 billion less than their carrying value on the

25   Company's books.  In turn, this meant that Wachovia's all-important capital ratios were materially

26   lower than disclosed.

27       60.    Indeed, as indicated above, despite its takeover by Wells Fargo, the total financial

28   impact of the high-risk strategies pushed by defendant Thompson and readily acquiesced in by each

AMENDED COMPLAINT

1  member of the Wachovia Board have yet to be fully recognized by Wells Fargo. By acting as such

2  and permitting such manipulations and concealment to take place, the members of the Wachovia

3  Board, senior management and the Company's purportedly "independent" registered public

4  accounting firm," KPMG, have caused Wachovia to violate federal disclosure laws and subjected it

5  to litigation by those who purchased its securities and various proprietary derivative "products"

6  during the period of such wrongdoing.

7      61.     In turn, this has subjected and will subject the Company (and now Wells Fargo) to

8  expenses of more billions of dollars to resolve the claims of such purchasers or otherwise related

9  thereto.

10     62.     Further, the members of the Wachovia Board have long known or should have

11 known that KPMG was not independent of Wachovia, that it was the subject of an SEC

12 investigation regarding its lack of independence and that it failed to perform its audits of

13 Wachovia's financial statements in accordance with Generally Accepted Auditing Standards

14 ("GAAS") and SEC rules and regulations.  Further, KPMG knowingly prepared, falsified and

15 authorized the signing of letters stating that Wachovia's financial statements were prepared in

16 conformity with GAAP, when KPMG knew or should have known that such statements were false.

17     63.     For example, a commentator for Bloomberg, Jonathan Weil, described "Wachovia's

18 auditor, KPMG LLP" as one of the "lapdogs" who declined "calling" Wachovia about its balance

19 sheet.  In an analysis on October 30, 2008 entitled "Wachovia Shows Why No Bank's Books Are

20 Trusted," Weil notes how, in Wachovia management's "starry-eyed world, Wachovia's net assets

21 still were worth $50 billion as of Sept 30, according to the balance sheet the Charlotte, North

22 Carolina-based bank released last week."  Of course, as a result of the actions of its partners,

23 KPMG stood behind the accounting practices as reflected in that balance sheet and the ones upon

24 which it formally reported as of December 31, 2007.  Weil described Wachovia as "conjuring up

25 bogus asset values," as one of the companies who "bake their books," and that "[t]he reality is that

26 Wachovia's management, including Chief Executive Officer Robert Steel, still won't admit the

27 company's balance sheet is a farce and has been for a long time."  Weil's analysis dovetails with

28

1  that of the SEC when, as noted above, it started an investigation of defendant Steel's extreme

2  overstatements of Wachovia's financial condition.

3     64.     Particularly notable, Weil's analysis culminated in a section entitled "Goodbye

4  Goodwill." Describing Wachovia's valuation of its goodwill which, again, KPMG stood behind,

5  Weil said "The worst affront is Wachovia's claim that, as of Sept. 30, it still had $18.4 billion

6  worth of the intangible asset known as goodwill. . . .  Goodwill is the bookkeeping entry one

7  company records on its balance sheet when it pays a premium price to buy another.  We know

8  Wachovia's goodwill is worthless . . . ."  With the blessing of KPMG, Wachovia kept that $18.4

9  billion on its books for its Board's reckless acquisition of Golden West and massive overpayment

10  for it.  Only later, in Wachovia's last earnings report in October 2008, after Wells Fargo's

11  announced acquisition of it, did the Company finally recognize publicly a loss of $18.78 billion

12  "goodwill impairment" charge, finally addressing the monumental sham of the previous

13  Wachovia/KPMG claims about the accounting value of the Company's purchase of Golden West.

14     65.     The KPMG problem appears to go much deeper.  KPMG had an impossible conflict

15  of interest, starting as Wachovia's independent auditor and becoming Wells Fargo's.  KPMG

16  smoothed the transition by facilitating Wachovia's false books, rather than engaging in truth-telling

17  which would have upset the deal-makers, defendants Steel, John G. Stumpf and their subordinates.

18  While KPMG was Wachovia's independent auditor, KPMG got Wachovia in trouble time and

19  again.  As the author, David Callahan, summed up "[t]he latest scandal at KPMG": "Already under

20  fire for illegal tax shelters and helping Xerox inflate its earnings, KPMG is now accused of shady

21  conflict-of-interest dealings with Wachovia Bank.  The SEC is investigating whether Wachovia's

22  referrals of wealthy clients to KPMG violated rules regarding auditor-independence." At all

23  relevant times, KPMG knew or should have known of KPMG's lack of independence and conflicts

24  of interests, particularly when they signed KPMG's name to its reports on Wachovia's purportedly

25  audited financial statements.

26     66.     In another example of the conflict due to KPMG's auditing of the financial

27  statements of both Wachovia and Wells Fargo, KPMG also started a "fatal mistake" at Wachovia

28  which continued at Wells Fargo according to business commentator Francine McKenna. Wachovia

1   had a portfolio of credit default swaps, one of the new instruments that Wachovia's management

2   neither fully understood, handled prudently nor properly disclosed, which portfolio Wells Fargo

3   inherited.  While auditing Wachovia's financial statements, KPMG supervised the accounting for

4   and inadequate disclosure of the risk from those credit default swaps.  McKenna "saw limited

5   discussion of this risk and no details of the reserves for it in Wells Fargo's 2008 Annual Report."

6   Wells Fargo was and continues to be injured because KPMG, due to its multiple conflicts of

7   interest, created and had accepted by management a false, risk-free portrait of some of Wachovia's

8   most questionably-valued assets, thereby continuing the concealment of the actual value of the

9   Company's assets acquired by Wells Fargo.  Notwithstanding such egregious conduct on the part of

10  KPMG, the Wells Fargo Board not only continues to retain its services but has not pursued the very

11  valuable claims that Wachovia and now Wells Fargo have against it.

12      67.     As set forth above, defendant Thompson and his colleagues in Wachovia's senior

13  management turned the Company into a "house of cards."  This occurred mostly through

14  acquisitions but, as well, through the purchase and sale of esoteric financial instruments that were

15  based upon, among other things, sub-standard and highly risky mortgage loans and their securitized

16  brethren, CDOs and SIVs, some of which the Company retained for its own portfolio.

17  Notwithstanding these facts known or which should have been known to each of them, Wachovia's

18  Board continued to retain defendant Thompson as CEO of the Company when he should have been

19  terminated outright.

20      68.     Each Wachovia Board member and the Company's senior management was aware

21  of or should have been aware of the consequences to the Company of following Mr. Thompson's

22  "risk-be-damned" strategies in his competition with his Charlotte-based neighbor, Ken Lewis, of

23  Bank of America Corporation, and the damages they were likely to and did cause Wachovia, its

24  shareholders and its customers eventually.

25      69.     These massive damages, which first began to surface at the end of 2007 and have

26  increased substantially as the Company and Wells Fargo are forced to acknowledge further the

27  reality of Wachovia's contingent liabilities referred to above, the remainder of its highly

28

1    questionable loan/derivatives portfolio burdened with excessive credit risks and its off-balance

2    sheet transactions.

3    **Wachovia's Dissemination Of False And Misleading Information Concerning**

4    **Its Financial Condition And Risk Exposure**

5    70.    The Company's Board and senior management repeatedly made false statements

6    regarding the true financial and operating condition of Wachovia and gave false assurances

7    regarding the sufficiency of its risk management processes. These false and deceptive statements,

8    aided and abetted by KPMG, caused the market prices of Wachovia's stock to be artificially

9    inflated. In the context of these artificially inflated market prices, many thousands of investors

10    purchased Wachovia securities and were thereby defrauded.

11    71.    In addition, as part of their duty to exercise good faith and diligence in the

12    administration of the affairs of the Company, the Wachovia Board and senior management had a

13    duty to promptly disseminate accurate and truthful information with regard to the Company's

14    revenue, margins, operations, performance, management, projections, and forecasts, as well as

15    other material facts bearing upon its operations and financial condition. The Wachovia Board,

16    aided and abetted by KPMG's unjustifiable reporting upon Wachovia's financial statements, not

17    only failed to disseminate truthful information concerning the Company's varied and extensive

18    participation in subprime financing, but caused the Company to engage in transactions designed to

19    conceal the Company's true financial and operating condition and artificially inflate the prices of its

20    securities.

21    72.    The Board and senior management also recklessly or intentionally understated

22    Wachovia's exposure to subprime mortgages, failing to disclose the actual exposure faced by the

23    Company due to the CDO and subprime holdings of Golden West and Wachovia affiliates, which

24    the Company would have to include in its own financial statements, given the increasingly illiquid

25    market for the securities.

26    73.    In 2005 and 2006, the Federal Reserve instituted a series of interest rate increases

27    and the interest rates on variable rate loans, including mortgage loans, began to rise. Many

28    subprime borrowers, who were able to afford the artificially low "teaser rate" loan payments

applicable to their Golden West and Wachovia mortgages, no longer could meet their monthly payment obligations. At the same time, home values began to decline sharply, particularly in California, leading many borrowers to walk away from loans when they could not afford the increased monthly mortgage and could not readily re-sell their properties with any equity remaining. As a result, many borrowers no longer paid the amounts due on their mortgages, causing defaults at Golden West and Wachovia to increase significantly. The widespread defaults on the subprime mortgages that purportedly supported Wachovia's reported earnings and net worth rendered such data false and misleading, particularly since the Company's management knew or should have known that the reserves for loss from its mortgage portfolio was materially lower than they should have been. This was particularly so since the imminent collapse of the subprime lending industry was widely-documented.

74. The subsequent collapse of the subprime lending industry -- which was well underway by March of 2007 -- confirmed that subprime and other high-risk mortgages of the types that Golden West and Wachovia had been making were indeed highly risky and vulnerable to material markdowns in value.

75. On March 13, 2007, the Mortgage Bankers Association announced that during the fourth quarter of 2006, United States subprime borrowers fell behind in their mortgages at the highest rate in over four years -- up nearly a point from the previous quarter -- and that foreclosures had jumped to an all-time high. James Tyson, *Senate Weighs Aid to 2.2 Million Subprime Borrowers,* BLOOMBERG NEWS (March 13, 2007).

76. In the wake thereof and upon the public disclosure of the Company's deteriorated financial and operating condition, class and individual claims were asserted against the Company, for which it (and now Wells Fargo) will ultimately be required to pay substantial sums to defend against and settle such meritorious claims. KPMG and the members of the Wachovia Board, caused the Company (and now Wells Fargo) to be subject to such liabilities.

**The Acquisition Of Wachovia By Wells Fargo**

77. Ultimately, in the wake of the Wachovia Board's failure to rein in defendant Thompson and failure to follow the most basic principles of corporate governance, the Company's

financial and operating condition worsened materially throughout 2007 and into 2008, at which time Wachovia sought a "rescue" from another financial institution under the auspices of federal banking regulators.

78.     In such circumstances, with only a rushed and poorly researched analysis of Wachovia by Wells Fargo, a bidding war ensued between Wells Fargo and Citigroup, Inc. Wells Fargo, without sufficient knowledge of the true financial and operating condition of the Company, which was concealed by its management, its Board and KPMG, acquired Wachovia in a stock-for-stock merger transaction.

## REQUIRED PRE-SUIT DEMAND ON THE BOARDS OF DIRECTORS OF
## WACHOVIA AND WELLS FARGO

79.     The errors and omissions of the Wachovia Board as described above, as well as those of senior management of the Company, the Sandlers and KPMG, have caused massive damages to the Company and its shareholders. This conduct has given rise to the existence of very substantial claims against the members of the Wachovia Board named herein, its senior management, the Sandlers and KPMG, which claims Wachovia failed to pursue, some of which may have been allowed to expire due to the running of applicable statutes of limitations without appropriately protecting Wells Fargo with tolling agreements or otherwise.

80.     Wells Fargo succeeded to ownership of these valuable claims and, despite the demands of Plaintiff on the Wachovia Board and the Wells Fargo Board as discussed more fully below, Wells Fargo has not pursued such claims, thereby wasting its own corporate assets. Similarly, it has not caused Wachovia to pursue any of such claims. Even more egregiously, the Wells Fargo Board has acquiesced in the *Arace* settlement pursuant to which neither Wells Fargo nor its shareholders received anything of material value. Upon information and belief, defendant Stumpf personally approved of the *Arace* settlement. In the wake thereof and his earlier role in the acquisition of Wachovia, he was rewarded by the Wells Fargo Board at the end of 2009 with an $18.7 million compensation package (which could be valued as high as $24 million) for the year.[12]

---

[12] Defendant Stumpf is the highest paid financial executive in the United States according to a survey reported by The New York Times on February 11, 2010.

81.   By letter dated April 1, 2009, in compliance with Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiff, through his counsel, made demands on the Boards of Directors of both Wells Fargo and Wachovia to, *inter alia*, pursue through litigation, the claims alleged in this action and name as defendants those identified above, among others responsible for the wrongdoing as alleged herein (the "Demand Letter").  A copy of the Demand Letter is attached hereto as Exhibit "A."  By sending the Demand Letter, Plaintiff effectively presented Wachovia and Wells Fargo with pre-suit notice that if their Boards did not cause them to commence the demanded litigation, Plaintiff would do so himself. More than one year has elapsed and the Wells Fargo Board has not acted upon any of the demands set forth therein. Further, although counsel for the Wells Fargo Board maintains that an "investigation" was carried out with respect to certain of the claims asserted herein by a "Special Committee" of the Wachovia Board and by Nelson (and a report generated thereupon), upon information and belief, the Wells Fargo Board never even read or considered such "investigation," the purported report thereupon or otherwise reacted to the Demand Letter until after this action was commenced.

82.   Although the Demand Letter was sent to the Boards of both Wells Fargo and Wachovia, at no time did Plaintiff concede that any member of such Boards could be dis-interested or independent with respect to the claims made therein; indeed, they were not and are not. In particular, the Demand Letter stated:

> The demands that I have made in this letter and the fact that they have been made should not be taken to mean that any of you is independent, disinterested or can properly and objectively deal with such demands, which you cannot. Should you not act to protect Wells Fargo's and the Company's valuable claims as set forth herein, you will be engaging in further waste of its assets.  The demands have been made because, if they had not been, your counsel and/or counsel for Wells Fargo would seek to have dismissed any shareholder's derivative litigation that might be commenced.

83.   The respective Boards of Directors abdicated their responsibilities to Wells Fargo and its shareholders and did not respond to the Demand Letter thereby effectively rejecting the demands made therein.  No effort was made by either Board to cause the Company and/or Wells

1  Fargo to act upon the demands set forth in the Demand Letter or otherwise act to preserve their

2  respective corporate assets. Further, no member of either Board or their respective legal counsel

3  even bothered to communicate with Plaintiff's counsel regarding the Demand Letter until after this

4  action was commenced.

5  **JURISDICTION AND VENUE**

6       84.    This Court has jurisdiction over all claims asserted herein under 28 U.S.C. §1332, as

7  complete diversity exists between plaintiff and each defendant, and the amount in controversy well

8  exceeds the jurisdictional minimum of this Court.

9       85.    This action was not brought collusively to confer jurisdiction on a court of the

10  United States that would not otherwise have jurisdiction.

11       86.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other

12  things, many of the acts alleged and complained of herein occurred in this District and most, if not

13  all, of the defendants reside in and/or have transacted business within this District. Further, to the

14  extent that the members of Wachovia's Board caused the *Arace* settlement to be consummated,

15  they breached fiduciary duties they owed to Wells Fargo and its shareholders and wasted Wells

16  Fargo's corporate assets, including, *inter alia*, the claims relating to Wachovia's acquisition of

17  Golden West.

18       87.    Plaintiff brings this action derivatively on behalf of Nominal Defendant Wells Fargo

19  and its shareholders and double derivatively on behalf of Wachovia. No claims for damages are

20  asserted against Wells Fargo or Wachovia. Plaintiff will adequately and fairly represent the

21  interests of Wells Fargo and its shareholders in enforcing and prosecuting their rights.

22  **THE PARTIES**

23  **Plaintiff**

24       88.    Plaintiff J. N. Feuer is a citizen of Indiana who owns and has owned common stock

25  of Wachovia and Wells Fargo at all relevant times.

26  **Nominal Defendant**

27       89.    Nominal Defendant Wells Fargo, a Delaware corporation, is one of the world's

28  largest banking, financial services, brokerage, wealth management, capital markets, and advisory

1    companies. Its principal place of business is in San Francisco, within this District. Plaintiff makes

2    no damage claims against the Company.

3    **Individual Defendants**

4        90.      Defendant G. Kennedy Thompson was at relevant times a Director, Chairman of the

5    Board, and Chief Executive Officer of Wachovia. After the Wachovia Board first took away his

6    title of Chairman, in early 2008, Wachovia announced that defendant Thompson had resigned his

7    remaining positions with the Company. Notwithstanding such voluntary resignation, he was

8    compensated as if he had been terminated involuntarily and is reported to have received termination

9    benefits of millions of dollars, notwithstanding the debacle that he and the members of the

10    Wachovia Board had caused to befall the Company.

11        91.      Defendant Thomas J. Wurtz was, at all relevant times, Senior Executive Vice

12    President and Chief Financial Officer of Wachovia. During the Relevant Period, he carried out

13    defendant Thomson's policies and directives and was instrumental in promoting the acquisition of

14    Golden West.

15        92.      Defendants Herbert and Marion Sandler are the former controlling shareholders of

16    Golden West and residents of this District and citizens of California. As a result of the sale of

17    Golden West, they and entities they controlled received consideration valued at $ 2 billion

18        93.      Defendants John T. Casteen, Maryellen C. Herringer, Joseph Neubauer, Timothy D.

19    Proctor, Van L. Richey, Dona Davis Young, Ernest S. Rady, Jerry Gitt, John D. Baker, II, Peter C.

20    Browning, Donald M. James, John C. Whitaker, Jr., William H. Goodwin, Robert A. Ingram,

21    Mackey J. McDonald, Ruth G. Shaw and Lanty L. Smith, were all members of the Wachovia Board

22    during the Relevant Period and were and are personally responsible for the Company's actions

23    described above. During a portion of the Relevant Period, defendant Robert K. Steel was

24    Wachovia's President and Chief Executive Officer and is now, as is defendant John D. Baker, a

25    member of the Wells Fargo Board.

26        94.      Following the merger with Wachovia along with all other members of the Wells

27    Fargo Board, defendants Steel and Baker wasted Wells Fargo's corporate assets as described above.

28        95.      Defendant Philip. J. Quigley is the Lead Director of the Wells Fargo Board.

1   96.   Defendant John G. Stumpf is Chairman and Chief Executive Officer of Wells Fargo

2   and a member of the Wells Fargo Board.

3   97.   Defendants John S. Chen, Lloyd H. Dean, Susan E. Engel, Enrique Hernandez, Jr.,

4   Richard D. McCormick, Cynthia H. Mulligan, Nicholas G. Moore, Donald B. Rice, Judith M.

5   Runstad, Robert K. Steel, Stephen W. Sanger, John D. Baker, II and Susan G. Swensen were all

6   members of the Wells Fargo Board during the Relevant Period and since the acquisition of

7   Wachovia and were and are personally responsible for the waste of Wells Fargo's corporate assets

8   as described herein.

9   98.   Each of the defendants is a citizen of a state other than Indiana and, as such there is

10  complete diversity of citizenship between plaintiff and each such defendant.

11  **CAUSES OF ACTION**

12  **COUNT I**

13  **BREACH OF FIDUCIARY DUTY**

14  99.   Plaintiff incorporates by reference and realleges each and every allegation set forth

15  above as though fully set forth herein. The claims herein are asserted solely against the members of

16  the Wachovia Board and the Wells Fargo Board.

17  100.   Each of the such defendants owed either or both Wachovia and/or Wells Fargo and

18  their respective shareholders the highest fiduciary duties of loyalty, honesty, and due care in

19  conducting the Company's and, following its acquisition, Wells Fargo's affairs.  Each owed,

20  respectively, Wachovia and/or Wells Fargo and their respective shareholders the fiduciary duty to

21  exercise good faith and diligence in the administration of the affairs of both companies and in the

22  use and preservation of their respective property and assets.

23  101.   In taking Wachovia into massive investment and participation in highly risky

24  subprime financing, while failing to implement prudent risk-management processes, its senior

25  management (including defendants Thompson and Wurtz)  and Wachovia Board members

26  disregarded sound business practices and knowingly, intentionally, recklessly, or negligently

27  breached his or her fiduciary and other duties owed to the Company and its shareholders and,

28  thereby, caused the Company to waste its assets, expend corporate funds improperly, and impair its

AMENDED COMPLAINT

1    reputation and credibility for no legitimate business purpose, as a result of which Wachovia was on

2    the brink of collapse until federal intervention and its acquisition by Wells Fargo.

3         102.    Similarly, in taking no action to pursue and collect upon Wells Fargo's highly

4    valuable claims as set forth in the Demand Letter and, indeed, in ignoring the Demand letter as well

5    as possibly permitting claims against the Sandlers, KPMG, the Wachovia Board and others to

6    expire due to the running of applicable statutes of limitation and permitting the *Arace* settlement to

7    proceed, each member of the Wells Fargo Board has committed waste of corporate assets, thereby

8    damaging Wells Fargo and its shareholders.

9         103.    Accordingly, Plaintiff, on behalf of Wells Fargo and its shareholders and double

10    derivatively on behalf of Wachovia, seeks from the individual defendants monetary damages to

11    compensate Wachovia and Wells Fargo for their damages, injunctive remedies, and other forms of

12    equitable relief.

13                               **COUNT II**

14                  **BREACH OF FIDUCIARY DUTY**

15         104.    Plaintiff incorporates by reference and realleges each and every allegation set forth

16    above as though fully set forth herein. The claims herein are asserted solely against the members of

17    the Wachovia Board.

18         105.    Each of such defendants owed Wachovia the highest fiduciary duties of loyalty,

19    honesty, and due care in conducting the Company's affairs. Each owed Wachovia the fiduciary

20    duty to follow and or comply with federal banking rules, regulations and policies in connection

21    with their conduct of the Company's business as set forth above.

22         106.    In acting as described herein, Wachovia Board members disregarded sound business

23    practices and the rules, regulations and policies of federal banking regulators as well as Wachovia's

24    own internal guidelines and codes of conduct. Thus, they knowingly, intentionally, recklessly, or

25    negligently breached his or her fiduciary and other duties owed to the Company and its

26    shareholders and, thereby, caused the Company to waste its assets, expend corporate funds

27    improperly, and impair its reputation and credibility for no legitimate business purpose, as a result

28

1   of which Wachovia was on the brink of collapse until federal intervention and its acquisition by

2   Wells Fargo.

3         107.    Accordingly, Plaintiff, on behalf of Wells Fargo and its shareholders and double

4   derivatively on behalf of Wachovia, seeks from the members of the Wachovia Board monetary

5   damages to compensate Wachovia and Wells Fargo for their damages, injunctive remedies, and

6   other forms of equitable relief.

7                            **COUNT III**

8                            **NEGLIGENCE**

9         108.    Plaintiff incorporates by reference and realleges each and every allegation set forth

10  above as though fully set forth herein. The defendants to this Count are the members of the

11  Wachovia Board.

12        109.    Each named individual defendant who was a Director or member of Wachovia's

13  senior management was negligent in the performance of his or her responsibilities for the

14  management and governance of Wachovia, as a result of which the Company and Wells Fargo were

15  and continue to be substantially damaged in an amount presently unknown.

16        110.    Accordingly, Plaintiff, on behalf of Wells Fargo and its shareholders, seeks from the

17  members of the Wachovia Board named as defendants herein, monetary damages.

18                            **COUNT IV**

19                   **BREACH OF CONTRACT**

20        111.    Plaintiff incorporates by reference and realleges each and every allegation set forth

21  above as though fully set forth herein. The claims herein are asserted solely against the Sandlers.

22        112.    Pursuant to the sale of Golden West to Wachovia, the Sandlers made representations

23  and warranties to Wachovia with respect to, *inter alia*, the financial and operating condition of

24  Golden West.  In particular, among such representations and warranties were that Golden West's

25  financial statements reflected its actual condition and the value of its earnings, assets and net worth.

26  In fact, Golden West's earnings, assets and net worth were not as represented and were materially

27  overstated because, *inter alia*, inadequate provision was made by the Sandlers for loan losses which

28  were known or should have been known to them.

AMENDED COMPLAINT

113.   As a consequence of the Sandlers' breach of contract with Wachovia, of which contract the Sandlers were beneficiaries, Wachovia was damaged to the extent of at least many hundreds of millions of dollars.

114.   Accordingly, Plaintiff, on behalf of Wells Fargo and its shareholders, seeks from the Sandlers, payment to Wachovia and/or Wells Fargo for the monetary damages caused by the Sandlers' breach of contract.

## COUNT V

## NEGLIGENT MISREPRESENTATION

115.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein. The claims herein are asserted solely against the Sandlers.

116.   Pursuant to the sale of Golden West to Wachovia, the Sandlers made representations and warranties to Wachovia with respect to, *inter alia*, the financial and operating condition of Golden West. In particular, among such representations and warranties were that Golden West's financial statements reflected its actual condition and the value of its earnings, assets and net worth. In fact, Golden West's earnings, assets and net worth were not as represented and were materially overstated because, *inter alia*, inadequate provision was made by the Sandlers for loan losses which were known or should have been known to them.

117.   In connection with making the foregoing representations and warranties, the Sandlers negligently misrepresented Golden West's true financial and operating condition.

118.   As a consequence of the Sandlers' negligent misrepresentation of Golden West's true financial and operating condition, Wachovia proceeded with its acquisition and was damaged to the extent of at least many hundreds of millions of dollars.

119.   Accordingly, Plaintiff, on behalf of Wells Fargo and its shareholders, seeks from the Sandlers, payment to Wachovia and/or Wells Fargo for the monetary damages caused by the Sandlers' foregoing negligent misrepresentations.

## COUNT VI

## FRAUD

AMENDED COMPLAINT

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein. The claims herein are asserted solely against the Sandlers.

121.    Pursuant to the sale of Golden West to Wachovia, the Sandlers made representations and warranties to Wachovia with respect to, *inter alia*, the financial and operating condition of Golden West.  In particular, among such representations and warranties were that Golden West's financial statements reflected its actual condition and the value of its earnings, assets and net worth. In fact, Golden West's earnings, assets and net worth were not as represented and were materially overstated because, *inter alia*, inadequate provision was made by the Sandlers for loan losses which were known or should have been known to them.

122.    In connection with making the foregoing representations and warranties, the Sandlers fraudulently misrepresented Golden West's true financial and operating condition.

123.    As a consequence of the Sandlers' fraudulent misrepresentation of Golden West's true financial and operating condition, Wachovia proceeded with its acquisition and was damaged to the extent of at least many hundreds of millions of dollars.

124.    Accordingly, Plaintiff, on behalf of Wells Fargo and its shareholders, seeks from the Sandlers, payment to Wachovia and/or Wells Fargo for the monetary damages caused by the Sandlers' foregoing fraudulent misrepresentations.

## COUNT VII

## INDEMNIFICATION

125.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein. The defendants to this Count are the present and former members of the Wachovia Board and the Wells Fargo Board identified herein.

126.    Defendants, as fiduciaries and agents of Wachovia and/or Wells Fargo, breached their fiduciary and other duties to such companies and their respective shareholders, as set out above.

127.    Wells Fargo directly and through Wachovia has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it, including the failure of the members of the Wells Fargo Board to pursue the claims set forth in the

1   Demand Letter, acquiescing in the settlement of the *Arace* Case and otherwise acting as referred to

2   herein. Part of that injury suffered by Wachovia and Wells Fargo as a result of this wrongdoing by the

3   individual defendants may be liability to investors, to government regulators, and others. Accordingly,

4   Plaintiff, on behalf of Wells Fargo and its shareholders, seeks from the individual defendants

5   herein complete and full indemnification to the extent Wachovia and/or Wells Fargo is found liable for

6   the wrongdoing of these defendants and those who acted wrongfully together with them.

7                                  **COUNT VIII**

8                              **UNJUST ENRICHMENT**

9        128.   Plaintiff incorporates by reference and realleges each and every allegation set forth

10  above as though fully set forth herein.

11       129.   Each of the individual defendants was unjustly enriched by the payments made

12  and/or payable to them as compensation and otherwise by the Company.

13       130.   Throughout the Relevant Period, each of member of the Wachovia Board was paid

14  substantial fees for attending meetings and otherwise occupying positions as officers and/or

15  directors of Wachovia.

16       131.   Similarly, the senior officers of Wachovia, defendants Thompson, Steel and Wurtz,

17  among the defendants, were being paid and will be paid substantial salaries and other compensation

18  for their purported services to the Company as well as substantial and undeserved severance and

19  retirement payments. All of such payments and fees were unearned and unjustified since these

20  officers and directors so utterly failed to fulfill their responsibilities for the management and

21  governance of the Company.

22       132.   Each of the defendants to this Count not only received and retained the funds

23  unjustly received but invested such funds, thereby receiving additional unjust enrichment.

24       133.   As a result of the foregoing unjust enrichment, each of the individual defendants

25  should be required to account to and repay Wachovia and Wells Fargo the respective amounts

26  unjustly paid plus interest based upon each of these defendants' investment and retention of the

27  proceeds of their unjust enrichment, and to disgorge all other profits, benefits, and compensation

28  obtained by them from their wrongful conduct.

AMENDED COMPLAINT

1

<b><u>COUNT IX</u></b>

2

<b><u>WASTE OF CORPORATE ASSETS</u></b>

3    134.    Plaintiff incorporates by reference and realleges each and every allegation set forth

4 above as though fully set forth herein. The defendants to this Count are the members of the

5 Wachovia Board and the members of the Wells Fargo Board.

6    135.    The wrongful conduct described herein reflected a wanton and reckless waste of

7 Wachovia's and/or Wells Fargo's corporate assets by their respective senior management and

8 Board of Directors which have, to date, cost the Company and its shareholders many billions of

9 dollars.

10    136.    Each of the individual defendants who were members of the Wachovia Board and/or

11 the Wells Fargo Board, was and is responsible for such waste and should be held accountable to

12 and repay the Company and Wells Fargo therefor.

13    137.    Similarly, by not pursuing the very valuable claims owned by Wachovia and Wells

14 Fargo as set forth in the Demand Letter and by permitting the settlement of the *Arace* Case to

15 proceed for no material consideration, each of Wells Fargo's Directors is wasting corporate assets

16 and should be held accountable therefor.

17

<b><u>COUNT X</u></b>

18

<b><u>VIOLATIONS OF SARBANES-OXLEY</u></b>

19    138.    Plaintiff incorporates by reference and realleges each and every allegation set forth

20 above as though fully set forth herein.  Defendants Thompson, Wurtz and Steel are the sole

21 defendants to this Count.

22    139.    Defendants Thompson and Steel, as Chief Executive Officers and defendant Wurtz,

23 as Chief Financial Officer of Wachovia, signed off on the financial statements of Wachovia and, as

24 such, were personally responsible for the accuracy thereof during the times they held the foregoing

25 positions.

26    140.    Such financial statements materially overstated the assets, earnings, and net worth of

27 Wachovia, and defendants Thompson, Steel and Wurtz engaged in misconduct when they approved

28 them.

AMENDED COMPLAINT

141.    Pursuant to Section 304 of Sarbanes-Oxley, defendants Thompson, Steel and Wurtz should be required to surrender to the Company, and therefore, to Wells Fargo, all compensation or other benefits paid or arguably payable by Wachovia and/or Wells Fargo that were based upon or otherwise tied to the Company's financial statements that were materially false.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays that the Court enter judgment against the defendants:

A.    Declaring that each of the members of the Wachovia Board and the Wells Fargo Board breached his or her fiduciary and other duties owed to Wachovia and/or Wells Fargo and their shareholders as alleged herein;

B.    Declaring that the Sandlers breached their contract with, defrauded and/or made negligent misrepresentations to Wachovia in connection with the sale of Golden West to Wachovia;

C.    Declaring that the settlement of the *Arace* Case or the releases therein are null and void;

D.    Directing all defendants, jointly and severally, to account for all losses and damages sustained by Wachovia and Wells Fargo caused by or otherwise in connection with the acts, omissions and transactions complained of herein;

E.    Awarding Wells Fargo money damages against all defendants, jointly and severally, for all losses and damages sustained and to be sustained by it and Wachovia as a result of the acts, omissions and transactions complained of herein;

F.    Directing all defendants to account for and to remit and disgorge to Wells Fargo all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation and common stock sales proceeds together with the earnings upon such amounts by which such defendants were unjustly enriched and imposing a constructive trust thereon as well as the earnings such defendants have received thereupon;

1    G.    Ordering that the present members of the Wells Fargo Board named as

2   defendants herein and those under their supervision and control refrain from further

3   misconduct as alleged herein and to implement corrective measures that will rectify all such

4   wrongs as have been committed and prevent their recurrence;

5    H.    Ordering Wells Fargo to take all necessary actions to reform and improve its

6   corporate governance and internal control procedures including, *inter alia*, establishing and

7   implementing effective loan underwriting standards and accounting for its operations and

8   financial condition in compliance with GAAP;

9    I.    Ordering defendants Thompson, Steel and Wurtz to surrender to the Wells

10   Fargo all compensation or other benefits paid or arguably payable by Wachovia and/or

11   Wells Fargo to either of them that were based upon or otherwise tied to its financial

12   statements that were materially false;

13    J.    Awarding Wells Fargo and/or Wachovia pre-judgment and post-judgment

14   interest as allowed by law;

15    K.    Awarding Wells Fargo and/or Wachovia punitive damages;

16    L.    Awarding Plaintiff's attorneys' fees, expert fees, consultant fees and other

17   costs and expenses; and

18    M.    Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a jury trial as to all issues so triable.

Dated: April 21, 2010                *Rose Luzon (w/permission)*
                                                                          *KMC*
                    ROSE F. LUZON (SBN 221544)
                    SHEPHERD, FINKELMAN, MILLER & SHAH,
                    LLP
                    401 West A Street, Suite 2350
                    San Diego, CA 92101
                    Telephone: (619) 235-2416
                    Facsimile: (619) 234-7334
                    Email: rluzon@sfmslaw.com

                    RICHARD D. GREENFIELD (*admitted pro hac vice*)
                    MARGUERITE R. GOODMAN
                    GREENFIELD & GOODMAN, LLC

AMENDED COMPLAINT

250 Hudson Street 8th Floor
New York, NY 10013
Telephone: (917) 495-4446
Facsimile: (212) 355-9592
Email: whitehatrdg@earthlink.net

JAMES E. MILLER (SBN 262553)
KAREN M. LESER-GRENON (SBN 231189)
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
         kleser@sfmslaw.com

SCOTT R. SHEPHERD
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com

Attorneys for Plaintiff

AMENDED COMPLAINT

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

**J. N. FEUER**, Derivatively on Behalf of
**WELLS FARGO & COMPANY**
and its Shareholders and Double
Derivatively on behalf of **WACHOVIA
CORPORATION,**

Plaintiff,

v.

Case No.
C10-279 PJH

**G. KENNEDY THOMPSON, et al**

Defendants

## VERIFICATION

I, J. N. Feuer, hereby declare and verify as follows:

I am the plaintiff in the above-captioned case. I have read the contents of the Amended Complaint. I am informed and believe, based upon information furnished by my counsel, that the facts related therein are true and, on that ground, I verify that the facts stated therein are true.

_____
J. N. Feuer

# EXHIBIT A

# GREENFIELD & GOODMAN LLC
## ATTORNEYS AT LAW
### 250 Hudson Street
### 8th Floor
### New York, NY 10013
### (917) 495-4446
### Fax (212) 355-9592
### email: whitehatrdg@earthlink.net

**Richard D. Greenfield**
*Also admitted to the Maryland
and Pennsylvania Bars*

April 1, 2009

Boards of Directors
Wells Fargo & Company and
Wachovia Corporation
420 Montgomery Street
San Francisco, CA 94104

VIA FedEx Tracking
# 845910090479

Dear Directors:

I am writing to you on behalf of my client, James N. Feuer, the owner of the common stock of Wells Fargo & Company ("Wells Fargo") which he received in exchange for shares of the common stock of Wachovia Corporation ("Wachovia" or "the Company") originally purchased in 2007. Copies of relevant pages from my client's brokerage account statements showing such ownership is enclosed with this letter. I have eliminated unrelated information. This letter is addressed to both Boards of Directors enen though the Wells Fargo website says: "Wachovia is now part of Wells Fargo."

This letter is being sent to you in the context of the revelations over the past 14 months or so of massive, multi-year reckless mismanagement of the Company, which has led to belatedly acknowledged losses (which would have been much higher had the Company properly reflected its true condition), additional provision for probable losses, the continuing concealment of contingent future losses and the actual deterioration of Wachovia's stockholders' equity of many billions of dollars,

1

primarily due to the conduct described herein, all of which resulted in the acquisition of Wachovia by Wells Fargo at a "bargain basement" price. As a result of the deception of Wachovia's senior management and others, the value of my client's investment has declined by more than 95%. In addition to his personal damages, the Company has been damaged incredibly.

Indeed, even through late 2008, prior to the Wells Fargo transaction, the investing public was kept in the dark by Wachovia. Had its management, Board and auditor fully and fairly accounted for the Company's financial condition, including making adequate provision for loan and other losses, it would have reported massive losses much earlier than it did and, particularly, before the date of my client's purchase.

The massive deterioration of Wachovia's financial condition was a function, in part, of its sheer size, which its Board and senior management recklessly permitted to grow without, *among other reasons*, taking appropriate steps to protect and preserve its assets. Indeed, there can be no doubt as to responsibility for the Company's mania for growth at any cost, which must be clearly laid at the Wachovia Board's doorstep. In The New York Times of February 6, 2008, it was recognized that the Company had "a reputation as an acquisition machine." Wachovia's Board and senior management created an ever-expanding behemoth and, in the process, wasted the Company's assets by staggering amounts by failing to oversee and carry out effective risk management. Even Wachovia's former CEO, Ken Thompson, whom its Board continued to stand by and defend despite taking away his title as Chairman, has effectively acknowledged that he and his colleagues have made Wachovia far too complex to manage and the Company's problems as "self-inflicted wounds." Under the circumstances, as noted in the Charlotte Observer on May 10, 2008, this change was nothing more than "window dressing" leaving "the same group of people performing the same roles."

Notwithstanding Mr. Thompson's belated acknowledgement that Wachovia's $25 billion acquisition of Golden West Financial Corporation in 2006 was "ill-timed," neither he nor Wachovia's Board have admitted that this acquisition was made without adequate due diligence and without considering the nature and poor quality of much of Golden West's loan portfolio, particularly mortgage loans originated through its "Pick-A-Payment" promotional activities (now adopted by Wachovia itself). The Company has set aside billions of dollars to date to cover Golden West's bad loans together with an additional billions for bad loans held otherwise.

With respect to the $121 billion loan portfolio the Company took over from Golden West, as indicated above, a substantial portion of them were its notorious "Pick-A-Payment" loans. Wachovia senior management, in recklessly making the

2

Golden West acquisition when it did, ignored that 60 percent of those loans were in the State of California, where real estate "bubble" conditions were prevailing. If they considered risk at all, Wachovia's senior management long-applied an inappropriate risk model to these loans, underestimating both their high likely rate of delinquency and foreclosure, and the substantial loss that will occur upon foreclosure. Far from acting to minimize its exposure, one obvious "red herring" was the imposition of minimum monthly sales quotas for "Pick-A-Payment" loans on employees, with incentive payments and high-pressure scripts to push this very dubious product upon the least appropriate homeowners. Even after it was well-know that "Pick-A-Payment" loans were a disaster for Wachovia, its Board continued to advertise such loans, which greatly increased the Company's risks and accumulated future liabilities for the sake of near-term appearances. In fact, in 2007, about one-fourth of Wachovia's mortgage volume ($22.81 billion out of $97 billion) was in option ARMs, for which borrowers could make payments of less than the interest – swelling the loan balance. In this type of loan, which predictably has become a financial disaster, Wachovia had the "honor" of being the second biggest provider in the country for last two years.

Not only did the Company, its investment bankers, lawyers and auditor fail to make a thorough and realistic assessment of Golden West's actual financial condition, but it had highly material contingent liabilities which neither the Wachovia Board nor the Company's advisors and auditors could competently evaluate. These contingent liabilities, which were known or should have been known to Golden West's controlling shareholders, the Sandlers, flow from Golden West's business practices which appear to have embroiled Wachovia in numerous governmental, criminal and civil investigations and litigation by borrowers, among others. It is bad enough that Golden West's condition was what it was at the time of the Company's acquisition of it, but when it was being considered as a prospective acquisition, Wachovia's Board failed to consider that the Company was already bloated and unable to cope with a "problem child" the size of Golden West and with the magnitude and complexity of the challenges it faced. Quite simply, Wachovia should have gotten its own house in order before taking on problems that could have been readily avoided.

In addition to the Golden West debacle, you have long known of or should have known that senior management of the Company had caused it to engage in highly illegal or other questionable conduct which subjected Wachovia to material damages. By way of example, Wachovia management knowingly had contracted to provide banking services to fraudulent telemarketers who bilked the elderly of hundreds of millions of dollars. In addition to being named a defendant in litigation

3

brought on behalf of the defrauded victims of this scheme, Wachovia has already paid out or committed to pay out as much as $140 million in connection with management's conduct, , including a $10 million fine to the Comptroller of the Currency. Many "red flags" warned the Company's Board and senior management of unsuitably & appropriate action.' Wachovia had received multiple warnings from banks, the Social Security Administration, and the Justice Department Federal Credit Union that its accounts were being used for fraud, and internal fraud investigators had told it, for example, that 79 percent of the checks submitted by one Wachovia "client" had been returned because of unauthorized withdrawals and the like – 2.5 percent being a sufficient fraud indicator.

Similarly, the Company is the target of an FBI/Department of Justice investigation of management's participation in municipal bid-rigging in the awarding of guaranteed investment contracts (generally issued by insurance companies and used to "park" municipal bond proceeds pending utilization). Moreover, Wachovia faces civil liability as well in lawsuits brought by Mississippi, Chicago, and Oakland, among other governmental entities, that have alleged that named employees of Wachovia would meet secretly and agree to take turns winning bids for these contracts.

In yet another law enforcement imbroglio, Wachovia faced questioning and subpoenas by the Securities and Exchange Commission, state regulators, and class-action lawsuits, over its issuance and sale of auction-rate securities. According to the lawsuits, Wachovia misrepresented to its customers that these securities were highly liquid, equivalent to cash or money market accounts, and suitable for short-term investing. In fact, investors could not sell their securities, while issuers such as cities and hospitals were forced to pay higher interest rates.

Wachovia is also the target of federal prosecutors in connection with its active participation in international money-laundering, principally concentrated in belatedly severed schemes and relationships with Mexican and Colombian money-transfer companies allegedly laundering drug proceeds, and, specifically, its compliance with anti-money laundering regulations. Wachovia's senior management pushed into this business despite well-publicized federal law enforcement concerns. The Company now faces a possible Justice Department demand that it enter into a deferred-prosecution agreement that would require extensive law-enforcement oversight. Wachovia management built up its ties to these money-transfer companies as its ill-advised way to tap the so-called Hispanic

4

market, demonstrating yet again an imprudent quest for growth without proper risk management.

The telemarketing, bid-rigging and money laundering scandals will, ultimately, cost the Company and Wells Fargo massive amounts in fines, defense costs and other damages, all of which could have been avoided had Wachovia's Board and senior management exercised prudent and effective operational controls.

Relatively late, Wachovia began to acknowledge exposure to sub-prime and other mortgage-related write-downs of assets, but has concealed the fact that only the "tip of the iceberg" has yet been disclosed to date despite the Wells Fargo takeover. Wells Fargo continues to materially overvalue Wachovia's assets by concealing its exposure to loss from improvidently extended credit card receivables, corporate loans receivable, additional real estate-related loans and "assets" where adequate provisions for losses have not been recognized. These include Wachovia's billions of dollars in mortgage-related CDOs, in commercial mortgage-backed securities, and in leveraged loans. Wachovia'S Board and management gambled heavily on such lending as commercial real-estate prices soared to temporary record levels. As you are aware or should be aware, such assets remain overvalued on Wachovia's and now Wells Fargo's financial statements by many billions of dollars and, as well, there are material contingencies which are not yet reflected or honestly described in the Company's or Wells Fargo's financial statements.

By way of one example, Wachovia is believed to have sold, through its subsidiaries, CDOs and other structured "investments," highly inappropriate, illiquid and unsuitable investment vehicles for most investors. Wachovia Management also sold to customers collateralized debt obligations ("CDOs") as well as other financial derivative "products" the sales of which that appear to have subjected the Company to various investigations by state and other regulators. Through its subsidiaries, Wachovia's packaging and sale of CDOs and other structured "products" have subjected the Company to massive liabilities to purchasers of such "products," none of which liabilities are reflected in its financial statements. It appears that there remain additional billions of concealed exposure to direct loss and claims.

It appears that, even with the virtual elimination of Wachovia shareholders' equity, its management intentionally understated and continued to understate such reduction. This financial debacle and the deception in its wake was caused by a systemic failure of risk management and lax credit standards during the last several years at the Board level and within senior management, all of which has caused

5

Wachovia to suffer billions of dollars in damages as described herein and untold
billions going forward, leaving it perilously short of capital which resulted in its
ultimate takeover by Wells Fargo. The Company's failure to honestly and fairly
disclose its true operational and financial condition as described herein violates the
principles behind and  purpose of the Company's "Corporate Governance
Guidelines."  Among other requirements of its directors, these Guidelines provide
that each of its Directors:

> 1. "Ensure that processes, controls and procedures are in place to
> assure the maintenance and integrity of Wachovia's accounting and
> financial records and statements"

> 2. "Apply themselves to understanding Wachovia's business, and the significant
> risks facing Wachovia"

> 3. "Conduct objective and thorough reviews and assessments of the
> CEO's performance…"

In fact, each Wachovia Director and former CEO Thompson did not act in
accordance with these Guidelines and knew or should have known that, as it was
structured, the Company's Board was unable to properly supervise the Company's
operations and management (which had grown to the point of being
uncontrollable), reduce its financial exposure to risk and make sure that its publicly
disseminated financial statements were prepared in compliance with Generally
Accepted Accounting Principles ("GAAP"), which they were not. Indeed, as
indicated above, the Company, despite its takeover by Wells Fargo, has yet to fully
recognize the total financial impact of the high-risk strategies pushed by Mr.
Thompson and readily acquiesced in by each of member of Wachovia's Board. By
acting as such and permitting such manipulations and concealment to take place,
the members of Wachovia's Board, senior management and the Company's
purportedly "independent" registered public accounting firm, KPMG, LLP, have
caused Wachovia to violate federal disclosure laws and subjected it to litigation by
those who, such as my client, purchased its securities and various proprietary
derivative "products" during the period of such wrongdoing. In turn, this has
subjected and will subject the Company (and now Wells Fargo) to expenses of
more billions of dollars to resolve the claims of such purchasers. Indeed, the
Wachovia Board members have long known or should have known that KPMG
was not independent of Wachovia, that it was the subject of an SEC investigation
regarding its lack of independence and that it failed to perform its audits of
Wachovia's financial statements in accordance with Generally Accepted Auditing
Standards and SEC rules and regulations.

6

As you know, Mr. Thompson and his colleagues in Wachovia's senior management turned the Company into a "house of cards." This has occurred mostly through acquisitions but, as well, through the purchase and sale of esoteric financial instruments that were based upon, *among other things*, sub-standard and highly risky mortgage loans and their securitized brethren, CDOs and SIVs, some of which the Company retained for its own portfolio. Notwithstanding these facts known or which should have been known to each of them, Wachovia's Board continued to retain Mr. Thompson as CEO of the Company when he should have been terminated outright.

Each Wachovia Board member and senior management was aware of or should have been aware of the consequences to the Company of following Mr. Thompson's "risk-be-damned" strategies and the damages they were likely to and did cause Wachovia, its shareholders and its customers eventually. These massive damages, which first began to surface at the end of 2007 after my client's purchase of Wachovia stock, are likely to increase substantially as the Company and Wells Fargo are forced to acknowledge further the reality of Wachovia's contingent liabilities referred to above, the remainder of its highly questionable loan/derivatives portfolio burdened with excessive credit risks and its off-balance sheet transactions. Also, due to the lowering of Wachovia's own credit ratings in the wake of the foregoing debacle, it suffered additional damages as its cost of capital had risen.

The errors and omissions of the Wachovia Board as described above, as well as those of senior management of the Company and KPMG have caused massive damages to the Company and its shareholders.

This letter is being sent to you to demand that Wells Fargo and/or the Company commence legal proceedings to recover its damages from each of Wachovia's Directors, from Wachovia's culpable senior management, who have also been responsible for the wrongdoing referred to herein, against KPMG, the controlling shareholders of Golden West, the Sandlers, and all those other persons or entities who have aided and abetted or otherwise participated in such wrongdoing. These additional persons and/or entities include, but are not limited to, those firms which directly or indirectly provided so called "appraisals" and/or credit ratings upon which the Company and/or the originators of the loans referred to above relied, directly or indirectly, to the Company's detriment.

7

This letter is also being sent to you to demand that Wells Fargo undertake fundamental corporate governance and policy changes to prevent recurrence of the debacle described in this letter, including failures of the Company's internal and external audits.

As you know, as a result of the misconduct referred to in this letter, Wells Fargo, through Wachovia, has already sustained substantial damages and continues to be subject to further damages in the billions of dollars as well as the massive legal and other expenses of defending against and resolving claims made against the Company arising from the conduct described above.

Similarly, to the extent that any of the foregoing persons has been unjustly enriched at the expense of the Company, including those entities and persons who have received fees and/or other compensation that was excessive under the circumstances referred to above, I demand that Wells Fargo and/or Wachovia commence litigation against them seeking injunctive relief which, requires them to account to it and repay any such unjust enrichment together with the earnings they have on such sums. Included within such unjust enrichment are amounts received by such senior officers (including the compensation paid and to be paid to Mr. Thompson) and, in the case of KPMG, fees paid to it during the relevant period for its purported audits of the Company's financial statements.

The demands that I have made in this letter and the fact that they have been made should not be taken to mean that any of you is independent, disinterested or can properly and objectively deal with such demands, which you cannot. Should you not act to protect Wells Fargo's and the Company's valuable claims as set forth herein, you will be engaging in further waste of its assets. The demands have been made because, if they had not been, your counsel and/or counsel for Wells Fargo would seek to have dismissed any shareholder's derivative litigation that might be commenced.

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,

Richard D. Greenfield
Enclosure

8